**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**


**UNITED STATES OF AMERICA,**

                Government,

                            **HONORABLE LAURIE J. MICHELSON**

    v.

                            **No. 21-20063**

**KATELYN JONES,**

                Defendant.

_____/


**SENTENCING HEARING**

**Detroit, Michigan  --  Tuesday, January 16, 2024**


**APPEARANCES:**

**Diane Nicole Princ, Esq.**
DOJ-USAO (Eastern Dist. of MI)
211 W. Fort Street, #2001
Detroit, MI 48226
Tel: (313) 600-9215
diane.princ@usdoj.gov
On behalf of Government

**Nancy L. McGunn, Esq.**
Federal Defender Office
613 Abbott, 5th Floor
Detroit, MI 48226
Tel: (313) 967-5555
nancy_mcgunn@fd.org
On behalf of Defendant

**Jonathan Edward Jacobson, Esq.**
DOJ-CRM - U.S. Department of
Justice Public Integrity Sec.
1301 New York Ave. NW
Ste. 10th Floor
Washington, DC 20530
Tel: (202) 934-0886
jonathan.jacobson@usdoj.gov
On behalf of Government

TITLE, (Cont.)

-   -   -

To Obtain A Certified Transcript, Contact:
**Nefertiti A. Matthews, Official Court Reporter**
**Theodore Levin United States Courthouse**
**231 West Lafayette Boulevard**
**Detroit, Michigan  48226**
**www.transcriptorders.com • jodi_matthews@mied.uscourts.gov**

Proceedings recorded by mechanical stenography.
*Transcript produced by computer-aided transcription.*

**Sentencing Hearing**
**Tuesday, January 16, 2024**

# I   N   D   E   X

-   -   -

Hearing:                                                Page:  Vol.:

**Sentencing Hearing** ...............................**5**     **1**

Allocution By Ms. Princ ..........................9      1

Allocution By Ms. McGunn ......................11      1

Statement By The Defendant ....................19      1

**Sentencing By The Court** ........................**20**     **1**

Response By Ms. McGunn .........................29      1

*Appeal Rights ...................................35*     *1*


Certification of Reporter ......................41

Exhibits:

None

1                              **Detroit, Michigan**

2                              **Tuesday, January 16, 2024**

3                              **3:03 p.m.**

4                                  **-   -   -**

5          **THE CLERK:**  The court calls Case Number 21-20063; <u>The</u>

6    <u>United States of America versus Katelyn Jones</u>.

7       Counsel, please state your appearance, for the record.

8          **MS. PRINC:**  Good afternoon, Your Honor.  Diane Princ

9    on behalf of the Government.  And present with me is Attorney

10   Jonathan Jacobson, from the Department of Justice.

11         **THE COURT:**  Okay.  There we go.  It's Mr. Jacobson?

12         **MR. JACOBSON:**  Yes, Your Honor.

13         **THE COURT:**  All right.  And Ms. McGunn.

14         **MS. MCGUNN:**  Nancy McGunn, on behalf of Katelyn Jones

15   who's standing to my left.

16         **THE COURT:**  All right.  Thank you.  Good afternoon,

17   Counsel.  Good afternoon, Ms. Jones.  You-all may be seated.

18       And actually, if I could just see counsel at side bar for

19   one moment, please?

20                                 **-   -   -**

21             **(Side Bar Conference at 3:04 p.m.)**

22         **THE COURT:**  Good afternoon, everyone.  I know we

23   filed everything under seal.  But I certainly intend to talk

24   about her medical issues.  Is that all right in light of the

25   people with us in the courtroom?

1          **MS. MCGUNN:**  It is.  I just reviewed with Ms. Jones,

2     I explained that there is a member of the press who is present

3     in the courtroom.  That I was going to, myself, talk about her

4     medical conditions, just not go into great detail.  So, she

5     understands and that's okay.

6          **THE COURT:**  Okay.

7          **MS. MCGUNN:**  Thank you.

8          **(Side Bar Conference concluded at 3:05 p.m.)**

9                         **-  -  -**

10                    **Sentencing Hearing**

11         **THE COURT:**  All right.  Thank you.  I accepted

12     Ms. Jones' straight-up guilty plea to the two charged counts of

13     threats of violence based on certain text messages and social

14     media postings.  Mr. Bellamy has prepared a thorough

15     presentence report.  And following some adjournments due to

16     Ms. Jones' health issues and some inabilities to travel, we're

17     here today for the sentencing.

18         Ms. McGunn, I want to first just make sure and confirm

19     that you and Ms. Jones had an opportunity to review and discuss

20     the presentence report?

21         **MS. MCGUNN:**  Yes, Your Honor.  We had an opportunity

22     to review the presentence report.  It was some time ago.  We

23     did have some factual corrections to make.  Those were made to

24     our satisfaction.

25         I would note, Your Honor, that the presentence report does

1    not reflect the most recent information in Ms. Jones' life.  I

2    had reached out to probation and probation indicated that The

3    Court would have to order an updated presentence report.  It's

4    certainly not anything that isn't discussed in our sentencing

5    memo, but I would ask that at the conclusion of the hearing

6    today The Court ask probation to update the presentence report

7    specifically to reflect that Ms. Jones, on November 15th, had a

8    child.

9            **THE COURT:**  All right.  Ms. Princ, any objection to

10   that?

11           **MS. PRINC:**  No, Your Honor.

12           **THE COURT:**  All right.  I don't see any problem with

13   making that modification and I will inquire and ask the

14   probation officer if we could make that addition to the

15   presentence report.

16       All right.  And Ms. Jones, did you have an opportunity,

17   and I know it has been awhile, but did you have an opportunity,

18   though, to ask Ms. McGunn any and all questions that you may

19   have had about the presentence report?

20           **THE DEFENDANT:**  Yes, I have.

21           **THE COURT:**  Was she able to answer those questions

22   for you?

23           **THE DEFENDANT:**  Yes, she was.

24           **THE COURT:**  And do you feel like you need or want any

25   additional time to discuss anything about the presentence

**Sentencing Hearing**
**Tuesday/January 16, 2024**

7

1   report with her before we continue today with your sentencing?

2          **THE DEFENDANT:** No, I do not.

3          **THE COURT:** Okay. Thank you.

4    And Ms. Princ, did the Government also have an opportunity

5   to review the presentence report?

6          **MS. PRINC:** Yes, we did. And we discussed one

7   objection prior to its final form and it was amended and we

8   have no other objections.

9          **THE COURT:** Okay. So, the parties have represented

10  there were some, I guess, some minor changes to be made to the

11  presentence report, those were addressed with the probation

12  officer. They were made. The Government's indicated it

13  doesn't have any others.

14    Ms. McGunn, does the Defense have any other disagreements

15  with, corrections or additions to the presentence report?

16         **MS. McGUNN:** None, Your Honor. Thank you.

17         **THE COURT:** Very good.

18    I've also received a copy of the presentence report. I've

19  received sentencing memorandums from the parties with

20  attachments to the defendant's memo of medical records and a

21  psychological evaluation as well as a letter from Ms. Jones'

22  mother and treating doctor. I also received a bond status memo

23  advising of Ms. Jones' compliance with her bond conditions.

24  I've carefully reviewed and considered all of those materials.

25  I've not received any other materials pertaining to the

1  sentencing.  And so except as otherwise stated, I am accepting

2  the presentence report as my findings of fact.

3      The parties appear to agree with the calculation of the

4  advisory guideline range in the presentence report and so do I.

5  The counts involve the same victim and common scheme or plan

6  and so they are grouped.  The base offense level is 12.

7      Given the victim's government position and that the

8  offense was motivated by her position, there is a six level

9  increase to the base offense level.  There is a two level

10  decrease for Ms. Jones' timely acceptance of responsibility and

11  a timely plea.  And all of that results in the base offense

12  level, if my math is right, is it -- do we have the extra point

13  for acceptance or it was just the two?  (Brief pause.)

14      No, we have the extra point.  So, I'm sorry.  So, there

15  were three level reduction for her timely plea and acceptance

16  of responsibility.  And so we have a total base offense level

17  of 15.  Ms. Jones has no prior criminal history so she is in

18  Criminal History Category I.  Given the nature of this offense

19  she does not qualify for the two level reduction for being a

20  zero-point offender.

21      So, an offense level of 15 and a Criminal History Category

22  of I results in an advisory guideline prison range of 18 to 24

23  months.  And, Counsel, are there any objections to that

24  calculation.  Ms. Princ?

25          **MS. PRINC:**  No.  Thank you, Your Honor.

1      **THE COURT:**  And Ms. McGunn?

2      **MS. MCGUNN:**  No, Your Honor.

3      **THE COURT:**  Are Ms. Princ, there any victims here

4  today who wish to be head?

5      **MS. PRINC:**  No.  Thank you.

6      **THE COURT:**  Okay.  Thank you.

7  So, at this time, do you with wish to make any remarks on

8  behalf of the Government?

9      **MS. PRINC:**  Yes, Your Honor.  Thank you.

10      **THE COURT:**  All right.  Why don't I have you come up

11  to the lecturn for me, if you would, please.

12  **ALLOCUTION BY MS. PRINC**

13      **MS. PRINC:**  Your Honor, we are seeking a sentence

14  within the guideline range.  We recognize and do not dispute

15  that Ms. Jones suffers from mental and physical ailments that

16  have been and will be addressed by the defense before Your

17  Honor.  Nevertheless, the Government stands by its

18  recommendation given the nature and circumstances of the

19  offense.

20  In this case, the defendant sent targeted, specific, and

21  horrifying texts to the victim.  Whatever one thinks of that

22  victim's decision, she was a public official and the

23  defendant's act was directed to instill fear within her to try

24  to influence her decision.

25  We cannot have citizens in our society acting this way

1    toward our public officials trying to influence their

2    decisions.  The defendant's texts sent to the victim included

3    her name, her address, her contact information.  Most

4    alarmingly, they were directed and contained threats about the

5    victim's daughter.  The photograph that the defendant sent to

6    the victim was a horrifying photograph of a mutilated, deceased

7    and bloodied corps.  And the defendant told the victim:  "I

8    want you to picture your daughter . . ." (using the daughter's

9    actual name), ". . . when seeing that image."

10       I recognize that the defendant, when she took these

11   actions, is not the same defendant that appears before Your

12   Honor today.  But given the nature of our public discourse.

13   Given the threats against officials, the Government is

14   recommending a sentence of 18 to 24 months to encapsulate harm

15   and to deter others from engaging in such acts.

16       Thank you, Your Honor.

17           **THE COURT:**  And just, Ms. Princ, how would you have

18   The Court go about, given that we, you know, we sentence

19   everybody individually and you've asked for a guideline

20   sentence, how does the nature of her significant, physical and

21   mental health impairments factor into that?

22           **MS. PRINC:**  I think Your Honor can consider those and

23   should consider those.  We set forth the recommendation for the

24   range.  There is a range before Your Honor, though.  And so you

25   can address those concerns by sentencing toward the bottom of

 1    the range.

 2              **THE COURT:**  All right.  Thank you, Ms. Princ.

 3              **MS. PRINC:**  Thank you.

 4              **THE COURT:**  And Ms. McGunn, if I could ask you and

 5    Ms. Jones to come to the lecturn as well, please.  And

 6    Ms. McGunn, I'm going to begin with you and ask if you would

 7    like to make any remarks on Ms. Jones' behalf?

 8    **ALLOCUTION BY MS. MCGUNN**

 9              **MS. MCGUNN:**  Thank you, Your Honor.

10         Your Honor, three year's ago Katelyn Jones sent messages

11    via text and social media postings that were graphic.  That

12    were threatening.  And that were terrifying.

13         Those messages were sent to AV-1.  Related to AV-1's then

14    role in Wayne County as part of the election, The Board of

15    Canvassers.  Ms. Jones' statements, as the Government has

16    accurately stated, didn't just reflect her unhappiness with

17    AV-1, they referenced personal information.  They referenced

18    AV-1's husband.  Her daughter.  They provided personal

19    information.  There is not one person in this courtroom,

20    particularly Ms. Jones, that disagrees with the contention that

21    this was an incredibly serious offense that had an undeniable

22    impact on AV-1 and on her family.

23         This contact represents one day out of Ms. Jones' life.

24    She, at that time, was 23 year's old and that day was truly an

25    aberrant and isolated instance.  This was an individual who had

Allocution By Ms. McGunn
Tuesday/January 16, 2024

12

1   never been in trouble before.  Frankly, has never been in

2   trouble since.  I'm not sure she's ever even had a speeding

3   ticket.

4       This offense, as indicated by the extensive information in

5   the presentence report and in our sentencing memo, this offense

6   really represents an awful confluence of factors that occurred

7   for Ms. Jones during this time period.

8       It was on the heels of a contested Presidential election

9   that left the country locally and violently divided in an

10  endless news cycle.  It was still in the midst of -- we were

11  still in the midst of the COVID-19 pandemic with rising

12  hospitalizations and death rates.  And in the midst of all of

13  that we had Ms. Jones, who is a young woman, with no criminal

14  history, in the midst of her own crisis.  She was at at that

15  point, I think it's fair to say, the lowest point of her young

16  life.

17      Three and a half years earlier at just 19 year's old she

18  had started to experience health issues that took medical

19  experts years to diagnose and properly treat.  She struggled

20  with very painful and life-threatening symptoms that as of

21  November 2020 had caused repeated and prolonged

22  hospitalizations at specialized hospitals like at U of M and

23  the Cleveland Clinic. With specialists that still struggle to

24  come up with the answers as to what she was dealing with from a

25  medical perspective.

**21-20063; United States of America v. Katelyn Jones**

Allocution By Ms. McGunn
Tuesday/January 16, 2024

13

1        At the time of the offense, Katelyn and her mother had

2   made the very difficult decision to move across the country to

3   get specialized medical treatment.  They had identified

4   specialists that they hoped could treat her very complex set of

5   conditions.  Your Honor, we have briefed this fully, but I know

6   The Court is aware that Ms. Jones struggles with -- suffers

7   from Evans Syndrome, which is a rare disorder, in addition to

8   lupus and APS.  All three of these conditions are chronic,

9   they're incurable, they have life-threatening symptoms, and

10   they require daily medications.

11        In the years, the three and a half years leading up to

12   this offense, Katelyn had struggled to have her physical health

13   stabilized, but she had also struggled with anxiety and

14   depression.  She had set about a course of mental health

15   treatment, DBT, that worked for her.  She found a therapist in

16   Michigan and things were going well.

17        But in the month's leading up to that move to New

18   Hampshire, her general practitioner decided to remove her

19   unilaterally from her psychotropic medications.  She had been

20   stabilized.  She was in a good place mentally and emotionally.

21   And her doctor as a response, frankly, to the repeated physical

22   hospitalizations, medical hospitalizations she had faced,

23   dramatically changed her regimen to a combination of

24   medications that led to a rapid decline to her mental health

25   and an increase in suicidal feelings.  Because of the move, she

1    was not able to get into a mental health specialist to see a

2    provider to get back on the correct medications; and thus, in

3    November 2020, she had been without medications that she very

4    much needed to treat her escalating mental health symptoms.

5        So, at the time of this offense, Katelyn was in New

6    Hampshire, a new place, without mental health support and

7    tremendous physical pain.  And, really, the entirety of her

8    world took place online.  Because she had previously lived in

9    Michigan and been involved in election events, she took a

10    particular interest in the post-election events in Wayne

11    County.  And because of the preoccupation with social media at

12    that time, the endless news cycle, she joined in a very loud

13    and vocal group of individuals online, on social media,

14    addressing the issues of what was going on in Wayne County at

15    that time:  The decision to certify or not certify the

16    election.

17        Unlike many of the other people weighing in, though,

18    Katelyn was uniquely vulnerable to what was going on at that

19    time.  And, so, as an individual struggling with mental health

20    issues, without proper medication, no social outlet, often

21    unable to sleep due to excessive pain, and watching endless

22    news and social media, she committed this offense conduct.

23    Those were the circumstances in which she committed this

24    offense conduct.

25        Following that, she was arrested.  She readily admitted

```
 1    her conduct.  She accepted responsibility that day and since
 2    that day has done everything she could to move beyond that
 3    behavior to acknowledge her wrongfulness and try to correct the
 4    course of conduct she was on.  She sought mental health
 5    treatment in New Hampshire.  She remained committed to
 6    treatment and psychotropic medication.  Her physical health has
 7    been stabilized through a really exceptional group of
 8    specialists through Harvard and multiple hospitals in Boston.
 9    Her health is monitored every few months by a variety of
10    specialists.
11         Perhaps, most miraculously on November 15th, Katelyn gave
12    birth to a healthy baby, an event she had been told would never
13    have been possible.  During the course of her pregnancy, she
14    had to go to weekly ultrasounds.  She traveled 35 minutes.  She
15    never missed one appointment.  And she was determined to do
16    whatever she could and had do to have a healthy baby.  She'll
17    speak to this in a moment, Your Honor.  But that pregnancy and
18    the birth of her child really dramatically changed Katelyn's
19    response for the positive.
20         Section 3553(a) calls for a sentence that's sufficient,
21    but not greater than necessary to meet the sentencing goals.
22    And our position, Your Honor, is that any custodial sentence
23    would be far greater than necessary to meet the goals of
24    sentencing.
25         With respect to the offense, there's no question this is
```

1    an undeniably serious offense; yet, it is isolated and aberrant

2    when looking at the totality of Ms. Jones' life.

3        In terms of her circumstances as an offender.  This was a

4    young woman with no criminal history.  Serious mental and

5    physical health issues at a very low point in her life.  In

6    over three years of pretrial release, she has amply

7    demonstrated a commitment to living within The Court's

8    conditions that were set for bond to following the law.  She's

9    demonstrated a commitment to her own mental health treatment.

10       And I have to say, Your Honor, this is a young woman

11    because of her health circumstances, I have gone to visit her

12    in New Hampshire.  We've had numerous Zooms.  We've had

13    numerous chats.  This is a woman who I believe very much has

14    lived daily with the tremendous fear that she was facing

15    incarceration on this day.  That prison was, in fact, possible

16    and likely, given her actions.  And she has carried the weight

17    of her actions for those three years.

18       She has tremendous family support.  Her parents are here

19    today.  Her mother, she remains living with her mother in New

20    Hampshire, along with her brother.  And her father is still

21    very much involved in her life.

22       In terms of the need to provide rehabilitation and

23    treatment.  Your Honor, it's really hard to believe that where

24    the University of Michigan and Cleveland Clinic struggled to

25    provide care, adequate care, somehow the Bureau of Prisons

1  could do that.  The list of medications that Ms. Jones is on

2  ranges from 7 to 15 medications at any given day or time.  She

3  has a list of specialists that she sees monthly.  She has a

4  serious clotting disorder.  She has conditions that threaten

5  her life if they're not monitored closely.  Any custodial

6  sentence would be significantly harsher on her than the average

7  individual that This Court sees.

8       Every defendant that This Court sentences I know has a

9  family that's impacted by sentences.  They have parents.  They

10  have children.  They may have children or partners.  In this

11  case, Ms. Jones has a two-month-old baby.  The loss of that

12  relationship, the breaking of that bond would be devastating

13  and also far greater than necessary.

14       In terms of the goal of punishment.  Ms. Jones, at 26, has

15  a felony conviction that will follow her for the rest of her

16  life.  It would impact her employment's future.  It will impact

17  -- has the potential to impact her housing circumstances and

18  myriad other aspects of her life.  And to achieve the goal of

19  punishment, a sentence of custody is simply not necessary.  The

20  Court could impose home confinement.  The Court could impose a

21  period of community service, if Ms. Jones was able to complete

22  that.  But there are a number options that The Court has.

23       In terms of the guideline range.  While it's true that the

24  Guideline Range is 18 to 24 months, probation has identified,

25  appropriately so, and the Government has not objected, to the

**Allocution By Ms. McGunn**
**Tuesday/January 16, 2024**

18

 1   idea that departures would be warranted under 4H1.3 for mental

 2   health and 4H1.4 for physical health.  The evaluation we

 3   submitted by Dr. Drukteinis we believe supports that finding

 4   for the departure, as well as Ms. Jones' physical history

 5   supporting a departure for physical health reasons.

 6         Lastly, Your Honor, with respect to deterrence.  The issue

 7   of individual deterrence I don't think is particularly

 8   significant, in this case, simply given Ms. Jones' lack of

 9   criminal history before and her lack of any activity since the

10   offense that suggests a need.

11         In terms of general deterrence.  I believe this is a

12   factor that Defense Counsel and the Government frequently

13   disagree about.  But I will give the Government, I understand

14   that in this type of case, with this type of task force that

15   has been forged to address a very specific threat that the

16   Government has identified, I understand the Government's focus

17   on general deterrence, but it cannot come at the cost of

18   Ms. Jones' very specific characteristics as a defendant.

19   Because to do so would really fly in the face of what the

20   Sentencing Statute calls for.

21         So, Your Honor, for those reasons and the reasons set

22   forth in our memo, we are asking that The Court impose a

23   non-custodial sentence and allow Ms. Jones to remain in

24   physical and mental health treatment within the community.

25         **THE COURT:**  Thank you, Ms. McGunn.

**Sentencing Hearing**
**Tuesday/January 16, 2024**

19

1      And Ms. Jones, it has been awhile since I took your plea

2  and at that proceeding I did indicate to you that you would

3  have this opportunity today, if you wished, to address The

4  Court before I impose sentence.

5      So, at this time, is there anything that you would like to

6  say?

7          **THE DEFENDANT:**  Yes.

8          **THE COURT:**  All right.  Please.

9  **STATEMENT BY THE DEFENDANT**

10         **THE DEFENDANT:**  Yes.  I'm not a very good public

11  speaker so I asked Ms. Nancy to put my letter in the sentencing

12  memo.

13     I'd just like to say that I'm not the same person that I

14  was in 2020.  I'm very remorseful and very sorry for what I've

15  done.  I've taken everything that I could and I've done

16  everything that I could to change and become a better person

17  and I'm lucky to say that I've done that.  And, yeah.  Thank

18  you, Your Honor.

19         **THE COURT:**  Thank you, Ms. Jones.  I do appreciate

20  hearing from you.  And I did review the materials.  I did see

21  the remarks or the letter.  I saw the reference to the video

22  that you sent to the victim.  Did she accept it?

23         **MS. MCGUNN:**  No, Your Honor.  But I do want to

24  clarify, that video was sent to the Government.  We had reached

25  out to the victim hoping to simply just share some information

1   about Ms. Jones and, kind of, the unique situation she was in.

2   The victim did not respond to us, which is obviously more than

3   her right to do so.  We did not reach out again.  I'm unclear

4   if the Government shared the communications that we shared with

5   them.

6                    **Sentencing By The Court**

7          **THE COURT:**  Okay.  There are some things in this case

8   that everybody agrees on and some things that we don't all

9   agree on.  The peaceful and orderly transition of power is a

10  fundamental hallmark of our democracy.  It must be cherished

11  and it must be preserved.  And efforts to subvert it need to be

12  thwarted.  But not with violence or threats of violence.  And

13  that is, in large measure, what happened here.

14         On November 16, 2020, following the contentious

15  Presidential election, the then Chair of the Wayne County Board

16  of Canvassers initially voted against certifying the election

17  results for the County.  You did not take it well and you

18  handled it worse.  The next day you sent threatening texts to

19  this election official chair and posted threatening Instagram

20  posts.  You called her names.  You accused her of being a

21  terrorist.  You threatened her husband.  And to make sure the

22  fear set in, you listed her address and phone number.  Yet,

23  even worse still, you threatened her young daughter in chilling

24  ways.

25         You told a loving mother it would be ashamed if anything

1    happened to her precious daughter at school.  You sent a photo

2    of a bloody, deceased, nude, and mutilated woman and suggested

3    that this could happen to her or her daughter.  If she was not

4    already afraid, you told her specifically she should be afraid

5    and that her husband should be afraid and that her young

6    daughter should be afraid.  Ended with:  "You have made a grave

7    mistake.  I hope you realize that now."

8         And, of course, the irony here is that you could have

9    written this line to yourself.  You know now that you've made a

10   grave mistake.  And I think we all agree it is even more grave

11   in our current political climate where election officials are

12   under attack and remain under attack, that they are very likely

13   going to take these threats seriously.

14        There is a reason that this country even has election

15   workers and election officials.  That we even have positions

16   like County Canvassers.  Because our democracy is built on and

17   only exist with our right to vote and free and fair elections.

18   And that requires our fellow citizens being willing to be in

19   position that administer elections.  They deserve to feel safe.

20   And they deserve to be safe.

21        You probably saw the statistics in the Government's

22   sentencing memo.  Nearly 1 in 6 election officials indicating

23   they have experienced threats because of their job.  And

24   77 percent have said that they feel the volume of those threats

25   has increased in recent years.

1          And Ms. Jones, part of what this case is about, part of

2     what the task force is about, is we can't allow this rhetoric

3     or conduct to be normalized.  It has to be stopped.  It has to

4     be prevented.  As the probation officer aptly remarked in the

5     presentence report:  "This conduct erodes the integrity of the

6     election system."  As the Government aptly remarked in its

7     sentencing memo, quote, "In our democratic society, we cannot

8     allow citizens to affect public officials' actions and

9     decisions through threats and fear," end quote.

10         We've heard this now in various ways from both lawyers to

11    put this election official and this wife and mother in fear for

12    her own life and that of her husband and that of her child is

13    cruel.  It's shameful.  And it's unacceptable.  It shows little

14    respect for the law and it's behavior that needs to be punished

15    and absolutely has to be deterred.

16         Which, along with the nature and circumstances of the

17    offense, are several of the sentencing factors that I have to

18    consider in determining a sentence that is sufficient, but not

19    greater than necessary to achieve the purposes of those

20    factors.  And so I'm not surprised to see the sentences handed

21    down across the country where election workers have been

22    threatened that are set out in the Government's sentencing

23    memo.

24         But when I evaluate the sentencing factors, another one

25    that I have to consider involves the unique and individual

1    history, characteristics, and background of the person I'm

2    sentencing.  And that is important here because while it does

3    not excuse your conduct, there are clearly other aspects of

4    your life that help to explain how this could have happened.

5         You were raised by loving and supportive parents.  You

6    grew up on a farm.  Were a skilled horse rider and had hopes of

7    becoming a trainer.  But for most of your young life you've

8    struggled with serious, incurable health problems which has

9    also resulted in serious mental health issues.

10        As Ms. McGunn has indicated you suffered from multiple

11   autoimmune disorders:  Lupus, Evans Syndrome, APS, in which

12   your immunity system is doing significant damage to your body

13   and causing debilitating symptoms and life-threatening

14   conditions, including blood clots, chronic pain and the

15   potential for organ damage.

16        You take about 7 to 15 medications.  You're unable to work

17   and you receive disability.  You missed a lot of school.  And

18   endured a lot of bullying due to your conditions.  You've

19   suffered from depression and engaged in self-harm since you

20   were 11.  And the chronic health conditions have exacerbated

21   your mental health issues.  Most significantly, you have

22   engaged in self-cutting since age 13.  You are currently

23   receiving psychiatric care and psychotherapy and you're taking

24   anti-psychotic medications to address the recently diagnosed

25   conditions of depressive disorder, PTSD, and borderline

**Sentencing By The Court**
**Tuesday/January 16, 2024**                                    24

1    personality disorder.

2         I recognize that at the time of the offense during the

3    pandemic and having just moved to New Hampshire with your

4    mother and your brother.  You were not receiving treatment or

5    taking psychotropic medications because your doctor was

6    changing and making some modifications to your medication

7    regimen.

8         Coupled with that, you were shuttered in watching nonstop

9    news and participating online.  Your mother is a former

10   Township Clerk responsible for certifying elections.  You

11   worked with her as an election's inspector and so you have a

12   sense of how these things should be done.  And so without

13   treatment or medications or proper coping mechanism to deal

14   with your anger over what you perceived to be election

15   inference, you lashed out.

16        With some additional maturity and more significantly,

17   proper medication and care, you have greater appreciation of

18   the wrongfulness of your conduct and the vital importance that

19   it never been repeated.  You recognize that these threats were

20   unacceptable.  You've expressed shame and remorse.  You tried

21   to reach on out to the victim to apologize with a statement.

22   You accepted responsibility.

23        When law enforcement came to your home to search it, you

24   admitted to what you did.  This is the first time you have ever

25   been in trouble with the law.  You have family support.  With

1    proper treatment and medication, you do not pose a serious risk

2    of harm.  You've never engaged in any violence.  There's

3    nothing to suggest you took any steps to act on your threats.

4    You have significant and life-threatening health issues that

5    will be difficult to manage in a prison setting.

6         Indeed, you have some rare and chronic autoimmune

7    disorders that, for a 26-year-old, are present to an unusual

8    degree under Guideline 5H1.4, to warrant a departure.  And even

9    if they did not, they are present to a significant degree to

10   justify a variance.  Especially when combined with your mental

11   health issues as well, that are also present to an unusual

12   degree under Guideline 5H1.3, to also warrant a departure or a

13   variance.

14        You've been compliant with your bond conditions for three

15   years and there have been no issues.  You are a new mother and

16   that will also be a strong deterrent to prevent you from

17   engaging in any like behavior in the future.  Probably most

18   important to the victim and the public, the extensive medical

19   information provided by your counsel supports your commitment

20   to actively engaging in mental health treatment.  You also have

21   the lifelong consequence of a felony conviction which should

22   also be a deterrence to others like you thinking of engaging in

23   this criminal behavior.

24        As your sentencing memo states, quote, "At 26, with no

25   criminal history, a newborn baby, and with serious health

 1    issues, she finds herself with a felony conviction and fearing

 2    for her freedom," end quote.  And that, too, is a strong

 3    deterrent.

 4         And so balancing the seriousness of the offense with the

 5    vital importance of deterrence, with the unlikelihood that you

 6    would ever do anything like this again, and your significant

 7    physical and mental health issues, I do think a sentence below

 8    the guideline range would be sufficient, but not greater than

 9    necessary here and would not result in any unwarranted

10    sentencing disparities.

11         And so I will GRANT a downward departure.  And even if I

12    did not grant a downward departure, I would grant a downward

13    variance.  But Ms. Jones, I'm not able to grant it to the level

14    of absolutely no prison time at all.

15         Like Ms. McGunn, I've struggled with the issue of

16    deterrence.  And people who engage in this misconduct have to

17    know that there will be consequences.  And I'm not saying that

18    there have not been consequences to you.  And that is why we

19    sentence everyone individually and as individuals.  You have

20    extenuating circumstances that most others likely do not have

21    and will not have and that has been considered in my ultimate

22    decision.  And that is the reason that I am not giving a

23    guideline sentence.  And that's the reason I'm giving you a

24    significant variance from a guideline sentence.  And I take

25    that responsibility to not only consider all of the 3553(a)

1   factors, but to then evaluate them against the individual

2   defendant.

3       And in doing that, Ms. Jones, **The Court is going to**

4   **sentence you as follows:**

5       **On Counts One and Two of the indictment, pursuant to the**

6   **Sentencing Reform Act of 1984, The Court considering the**

7   **sentencing guidelines and factors contained in 18 United States**

8   **Code Section 3553(a), hereby commits you to the custody of the**

9   **Bureau of Prisons for a term of 30 days.**

10      Once you finish that sentence, I'm going to put you on

11   supervised release for a term of two-years.

12      You will have to pay a special assessment of $200, which

13   will be due immediately.

14      I am going to waive the imposition of any fine, any cost

15   of incarceration, and any cost of supervision due to your lack

16   of financial resources.

17      I'm going to suspend any mandatory drug testing here

18   because you don't need it.

19      Under 34 United States Code Section 40702, you will have

20   to cooperate with the collection of a DNA sample as directed by

21   the probation officer.  And during the two-year period of

22   supervised release, you will have to follow and abide by the

23   standard conditions of supervised release that have been

24   adopted by this court or more likely New Hampshire because

25   that's probably where you'll be supervised.

1      And I'm going to also impose the following special

2   conditions of supervised release:

3      Due to the nature of the offense, you shall not engage in

4   any verbal or physically threatening or violent behavior.  You

5   must not have contact directly or indirectly with the victim in

6   this offense unless approved by the probation officer.

7      And due to your mental health issues, I will have you

8   submit to a psychological, psychiatric evaluation as directed

9   by the probation officer if warranted.  And I say, "If

10  warranted," because I know you'll go back to seeing your

11  regular treatment providers and so it may not be necessary for

12  you to participate in an additional program.

13     And the same is true, I will impose that you participate

14  in a mental health treatment program and follow the rules and

15  regulations of the program.  The probation officer, in

16  consultation with your treatment provider, will supervise your

17  participation in the program and, again, that will probably be

18  going back to your regular treatment provider.

19     You must take reasonable efforts to maintain medical

20  insurance during any period of supervised release to ensure

21  adequate mental health treatment.  And you must take all mental

22  health medications that are prescribed by your treating

23  physician.

24     And Ms. McGunn, in light of the time imposed here, do you

25  want me to make a recommendation to a BOP facility?

1    **RESPONSE BY MS. MCGUNN**

2         **MS. MCGUNN:**  Your Honor, I am concerned that the

3    presentence report does not reflect Ms. Jones' updated medical

4    information.  I realize that's not an answer to The Court's

5    questions.  It's a long-winded way of saying it's difficult for

6    me to see that Ms. Jones could go anywhere but a medical

7    facility, an FMC; but in order for her even be accepted in

8    there, it would need to be significantly more information in

9    the presentence report.  That's not a reflection on probation,

10   that's a reflection on the complexity of Ms. Jones' health

11   situation.

12        So, I would ask The Court -- if I could, I would actually

13   ask The Court to very much consider, in lieu of 30-days in

14   custody, placing Ms. Jones on home incarceration, truly not to

15   leave her residence which would accomplish the same purpose,

16   but allow no disruption in physical and mental healthcare.

17        **THE COURT:**  And I did consider that.  I mean, I've

18   had situations where we've provided the BOP with the medical

19   records, but is it a chicken or egg whether if they don't see

20   it in the presentence report they wouldn't designate her to a

21   medical facility?  Mr. Bellamy, do you know?

22        **PROBATION OFFICER:**  Your Honor, Kody Bellamy, on

23   behalf of the probation department.

24        In the statement of reasons that accompanies the judgment

25   in the presentence report, The Court can indicate that there's

 1   additional information that the Bureau of Prisons must consider

 2   prior to designating Ms. Jones.  I will be happy to work with

 3   the Bureau of Prison's designation office to ensure that any

 4   additional information that Ms. McGunn has was given to them

 5   before any designation occurred.

 6        The Court could also recommend that Ms. Jones be

 7   designated to an FMC.

 8        **THE COURT:**  Which, I'll definitely do.  I'll

 9   definitely include that.

10        Yes, Ms. McGunn.

11        **MS. MCGUNN:**  No, and I appreciate that tremendously.

12   And obviously we recognize that a sentence of 30 days is a

13   significant variance and departure.  In terms of FMC's for

14   women, I think the closest one to Ms. Jones might be Butner

15   North Carolina.  And we can get back to our specialist to see

16   if there's any additional information.

17        I, again, and I'm sorry to keep doing this, would implore

18   The Court to consider converting, even if we, instead of doing

19   30 days at a medical center, said 60 or 90 days on house arrest

20   with no movement beyond the home.  My concern is that Ms. Jones

21   is under such constant medical care that by the time she got to

22   an FMC -- I have clients with cardiac issues who, because of

23   medication lists, don't get the same medications once in the

24   Bureau of Prisons.

25        So, for this woman, who is taking seven -- so many years

1   to stabilize her medication, to put her in that mix, I think,

2   is terrifying, quite frankly.  So, I would very much ask The

3   Court to consider doubling or tripling the amount it want her

4   to serve in custody and placing her on house arrest instead,

5   with a GPS tether.  And the only reason she could leave is for

6   medical appointments.

7         **THE COURT:**  Are these medications that an FMC would

8   not have?

9         **MS. MCGUNN:**  I have no way to answer that, Your

10  Honor, at this point.  All I can say is given years of

11  litigation related to clients who don't have health issues

12  nearly as serious as Ms. Jones, seeing the disruption in

13  physical and mental health meds that occurs, because of a

14  difference in medications that are available in the community

15  versus within BOP, it's of tremendous concern.

16     This is a young woman who frequently makes trips to the

17  emergency room because when she experience the symptoms, she

18  needs immediate medical care.  And aside from the issue of

19  medication availability, I'm extremely worried about what her

20  condition would be in a BOP, even in a medical facility, Your

21  Honor.

22        **THE COURT:**  Well, maybe Mr. Bellamy or Ms. Princ will

23  know the answer to this.  If I impose this sentence, but the

24  BOP does not designate Ms. Jones to a medical facility where I

25  think they could manage for 30 days and where they've got a

1    connection with a medical facility who could, if they can't,

2    could I then say if they don't give that designation then I'll

3    convert the sentence to home confinement?  Ms. Princ, do you

4    know the answer to that once they designate her?

5           **MS. PRINC:**  I have not had that issue in my

6    experience.

7           **PROBATION OFFICER:**  Your Honor, I can speak to that.

8    I have had, in the past, defendants that have been sentenced

9    then later designated to a facility.  Does defendants then file

10   a motion with The Court and The Court order the Bureau of

11   Prisons to reconsider a designation?  And that has been

12   successful.  I have seen that in the past and I think that

13   maybe --

14          **THE COURT:**  Can I make the a custodial sentence

15   conditioned?  A 30-day custodial sentence conditioned on

16   Ms. Jones being designated to a medical facility and if the

17   BOP's is not able to do that, then I would convert it to 30

18   days of home confinement?

19          **PROBATION OFFICER:**  Your Honor, I believe that would

20   need to be addressed through an amended judgment.  I don't know

21   of any way possible where we can order a sentence conditioned

22   on a designation.

23          **MS. MCGUNN:**  And, Your Honor, if I could?  We

24   actually agree with that.  Having been on the other end of

25   that, having judicial recommendations that are made and then

1    not followed, there's no recourse because they are simply

2    recommendations and the judgment will stand.  It can't be in

3    the alternative.

4         **THE COURT:**  Well, that's why I'm inquiring if I

5    condition the sentence on it.  I'm not talking about a

6    recommendation -- I mean, it would be a recommendation, but it

7    would be a -- and Ms. McGunn, you've got all the medical

8    records, right?

9         **MS. MCGUNN:**  I do.  And, Your Honor, when I say that

10   the first week of records consist of about a thousand of pages.

11   There are more records than I think any one of us could get

12   through in a reasonable amount of time.

13       Ms. Jones' mother, who is present --

14        **THE COURT:**  Well, that may be enough to get her

15   designated.  It may be they don't read them, they just need to

16   see them.

17        **MS. MCGUNN:**  Understood, Your Honor.  I'm -- and I'm

18   sorry to keep saying this, it's terrifying the idea that they

19   wouldn't read them given the complexity of Ms. Jones' house

20   circumstances and the amount of time it has taken to get her to

21   this stabilized place.  Thirty days could be enough to derailed

22   her health tremendously.

23        **THE COURT:**  I don't want you to think I'm considering

24   this for the first time.  As the guts of the sentence and the

25   rationale for the sentence is I tried to find a time that

 1    wouldn't do that.  That wouldn't create that derailment, and
 2    yet, would still be sufficient but not greater than necessary
 3    and would satisfy the sentencing factors and would not put
 4    Ms. Jones in that peril.
 5         And so what I'm going to do, Ms. McGunn, I'm going to
 6    recommend in the judgment that Ms. Jones be designated to a
 7    medical facility.  I'm going to ask if you could provide
 8    probation with Ms. Jones' medical records.  And as part of the
 9    statement of reasons, we're going to provide those medical
10    records to the BOP.
11         And Mr. Bellamy, if I could see you at side bar for just
12    one moment?
13                          -  -  -
14              **(Side Bar Conference at 3:55 p.m.)**
15              **THE COURT:**  Are there any 14-day sentences?
16              **PROBATION OFFICER:**  Yes.  I've seen weekends.  I've
17    seen 14 days.
18              **THE COURT:**  I'm wondering if she's better 14 days in
19    a non-medical facility or 30 days in a medical facility?  And
20    for 30 days I don't know if they'll put her in a medical
21    facility either.
22              **PROBATION OFFICER:**  I don't think they would, Your
23    Honor.  I'm happy to work very close with BOP.  I'll keep in
24    contact with her designation office and share The Court's very
25    strong intention that she be designated to a medical facility.

1          **THE COURT:**  I think she'd be better in a medical

2   facility for 30 days than not in one for 14 days.

3          **PROBATION OFFICER:**  Absolutely.

4          **(Side Bar Conference concluded at 3:56 p.m.)**

5                          **- - -**

6          **THE COURT:**  Okay.  Thank you.  I wanted to confer

7   with Mr. Bellamy about the logistics and to make sure we can

8   provide all of this information to the BOP and we can.  And I'm

9   going to be hopeful that they will consider all of that

10  information and that they will designate Ms. Jones to a medical

11  facility where for the 30 days they'll be able to keep her

12  stable until her release.

13      And so then let me ask counsel, with the sentence that

14  I've just imposed, are there any objections that have not

15  previously been stated.  Ms. Princ?

16         **MS. PRINC:**  None from the Government.  Thank you,

17  Your Honor.

18         **THE COURT:**  And Ms. McGunn?

19         **MS. MCGUNN:**  None, Your Honor.

20                      **Appeal Rights**

21         **THE COURT:**  And I will advise Ms. Jones, you do have

22  a right to appeal the sentence that I've just imposed.  Any

23  appeal will have to be filed within 14-days of the date that I

24  enter final judgment or 14-days of any notice of appeal that

25  may be filed by the Government.

1     If you're not able to prepay the cost of the appeal, you

2   may seek leave to appeal without paying those costs and you may

3   also seek the assistance of the clerk of court in preparing the

4   notice of appeal.

5     And Ms. Princ, does the Government have any objection to

6   allowing Ms. Jones to self surrender?

7         **MS. PRINC:**  No.  Thank you.

8         **THE COURT:**  So, Ms. Jones, as you know, you've been

9   on bond for several years with a number of conditions and those

10   bond conditions are going to remain in place.  And at some

11   point in the future, and it may take awhile because we're going

12   to provide your medical records to the BOP.  So, I will

13   include, if I need to in the judgment, that there be no

14   designation before the BOP obtains your medical information.

15   But at some point, you'll receive notification from the Bureau

16   of Prisons as to where and when you are to report to serve your

17   sentence.

18     In the interim, between today and the time that you get

19   that notification, your bond conditions remain in place.  So, I

20   just need to remind you, if you were to violate any of those

21   conditions, your bond could be revoked and you could be

22   remanded immediately to serve your sentence.  Do you understand

23   that?

24         **THE DEFENDANT:**  Yes.

25         **THE COURT:**  And failing to appear at the designated

1    facility is a separate offense for which you could also receive

2    jail time.  Do you understand that also?

3                **THE DEFENDANT:**  Yes.

4                **THE COURT:**  All right.  Very good.

5        Then is there anything further that we need to do on this

6    matter today.  Ms. Princ, anything for the Government?

7                **MS. PRINC:**  No.  Thank you, Your Honor.

8                **THE COURT:**  Anything for the Defense?

9                **MS. MCGUNN:**  Yes, Your Honor.  It occurs to me that

10   it might make the most sense for The Court to withhold entry of

11   the final judgment until the presentence is formally updated,

12   medical records are uploaded, and then the judgment could be

13   entered, if that's possible.

14               **THE COURT:**  Yes, I will do that.

15               **MS. MCGUNN:**  So, then in probation, I'm not sure how

16   that occurs, just in terms of the update?  In terms of the

17   pregnancy?  If a second interview was conducted?  I don't know.

18               **PROBATION OFFICER:**  Depending on how much information

19   you provide, you could do another interview or if you wanted to

20   send proposed language to myself and the Government and we

21   could just insert that into the presentence report.  That's a

22   possibility as well.

23               **MS. MCGUNN:**  Okay.  We will consult with probation.

24               **THE COURT:**  Well, we're going to put in the

25   pregnancy, can we put in the presentence report, you know, just

1   a sentence that there are significant additional medical

2   records that will be provided to the BOP?  Or I guess for the

3   presentence report, just that there are significant, additional

4   medical records that are consistent with what is set forth in

5   the presentence report but they provide much more detail of

6   Ms. Jones' conditions?  Just to indicate there are . . .

7           **MS. MCGUNN:**  Yes, Your Honor, we can do that.  Yep.

8           **THE COURT:**  Without having to put all of that into

9   the presentence report.

10          **MS. MCGUNN:**  I have to say, I'm actually concerned

11  about not putting it into the presentence report.

12  Historically, we have not had great luck with Bureau of Prisons

13  actually reviewing medical records, that's why we want the body

14  of the presentence report to be as exacting as a possible.

15          **THE COURT:**  Okay.  So, can you provide a summary, a

16  new paragraph or two for inclusion and share it with Ms. Princ,

17  obviously.

18          **MS. MCGUNN:**  Yes.

19          **THE COURT:**  And then we could -- since we're going to

20  amend, add the pregnancy, we could amend to add more detailed

21  medical information.

22      All right.  Ms. Princ, do you have any issues with that?

23          **MS. PRINC:**  No.

24          **THE COURT:**  All right.  Ms. McGunn, anything further

25  for the Defense?

1          **MS. MCGUNN:**  No.  Thank you, Your Honor.

2          **THE COURT:**  And Mr. Bellamy, anything for probation?

3          **PROBATION OFFICER:**  Your Honor, strictly a wording.

4    It's The Court's intention that the sentence was 30 days

5    custody, per count, to be served concurrently?

6          **THE COURT:**  Yes.

7          **PROBATION OFFICER:**  And same for supervised release,

8    two-years, each count, to be served concurrently?

9          **THE COURT:**  Yes.

10         **PROBATION OFFICER:**  Thank you, Your Honor.

11         **THE COURT:**  And I mentioned the special assessment?

12         **PROBATION OFFICER:**  Yes.

13         **MS. MCGUNN:**  And, Your Honor, just so we can tie this

14   lose end up as well in terms of the wording.  Is The Court's

15   sentence that the sentence shall be served at a federal medical

16   center and if that request cannot be honored . . .

17         **THE COURT:**  No, because we thought that that was not

18   feasible.  So, I'm just going to include in the judgment a

19   recommendation to a federal medical center.  And I don't even

20   want to give an alternative because I want them to only see

21   that recommendation.

22         **PROBATION OFFICER:**  Your Honor, if I may?

23         **THE COURT:**  Yes.

24         **PROBATION OFFICER:**  I do know while The Court doesn't

25   have the authority to provide a specific facility, The Court

1  does have the authority to include that the sentence be served

2  in a federal facility to ensure that the Bureau of Prisons does

3  go through the designation process and doesn't attempt to have

4  Ms. Jones serve her sentence in a local facility.  So, if we

5  include that in the judgment, I do think it would be better.

6         **THE COURT:**  Okay.  So, the better way is to say:  I'm

7  recommending this sentence be served in a federal facility and,

8  more specifically, a federal medical center.

9         **PROBATION OFFICER:**  Yes.  Ordering the sentence be

10  served in a federal facility, recommending that it be served in

11  a federal medical center.

12         **THE COURT:**  Yes.  Very good.  Okay.  Thank you.  All

13  right.  Thank you, everyone.

14      Ms. Jones, good luck to you.  Take care of yourself.  And

15  I hope for this 30 days they take good care of you as well.

16      All right.  Everybody.  Thank you.

17         **(Whereupon proceedings concluded at 4:03 p.m.)**

18         -     -     -

19

20

21

22

23

24

25

```
 1

 2

 3                          -   -   -

 4                C E R T I F I C A T I O N

 5          I, Nefertiti A. Matthews, official court reporter

 6     for the United States District Court, Eastern District of

 7     Michigan, Southern Division, appointed pursuant to the

 8     provisions of Title 28, United States Code, Section 753,

 9     do hereby certify that the foregoing is a correct

10     transcript of the proceedings in the above-entitled cause

11     on the date hereinbefore set forth.

12          I do further certify that the foregoing

13     transcript has been prepared by me or under my direction.

14

15     Date: May 15, 2024

16

17     s:/Nefertiti A. Matthews
       Nefertiti A. Matthews,
18     Official Court Reporter

19                          -   -   -

20

21

22

23

24

25
```